# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| A SEAGATE 3TB HARD DRIVE CONTAINING A | ) |
| FORENSIC IMAGE OF A SAMSUNG CELLULAR PHONE | ) |
| LOCATED AT 1301 NEW YORK AVE NW | ) |
| WASHINGTON, DC | ) |

Case No. 25-SW-109

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251(a) (Sexual Exploitation of Children);  18 U.S.C. §§ 2252(a)(2) (Distribution of Child Pornography);  18 U.S.C. §§ 2252(a)(4)(B) (Possession of Child Pornography);  18 U.S.C. §§ 2422(b) (Coercion and enticement of a minor); 18 U.S.C. § 2423(c) (Illicit sexual conduct in foreign places). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Kim L. Speakman Jr., Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone _____ *(specify reliable electronic means)*.

Date:    4/18/2025

_____
*Judge's signature*

City and state:    Washington, D.C.

Zia M. Faruqui
(United States Magistrate Judge)

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.   25-SW-109 |
| A SEAGATE 3TB HARD DRIVE CONTAINING A | ) |
| FORENSIC IMAGE OF A SAMSUNG CELLULAR PHONE | ) |
| LOCATED AT 1301 NEW YORK AVE NW | ) |
| WASHINGTON, DC | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 02, 2025 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui _____ .
                                                                                                   *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 4/18/2025 _____                    _____
                                                                                                   *Judge's signature*

City and state: _____ Washington, D.C. _____                    Zia M. Faruqui
                                                                                                   United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

## Return

| Case No.:<br><br>25-SW-109 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is (1) Seagate 3TB hard drive (SN: Z1F0NMF4) containing a forensic image (hereinafter, "TARGET IMAGE") of a Samsung cellular phone with model number SM-G991U1 (hereinafter, "TARGET DEVICE"), with file name "EXTRACTION_FFS.zip" and hash value 02C69D186CD4AAD2267BAB737DED6972. The Seagate 3TB hard drive (SN: Z1F0NMF4) containing the TARGET IMAGE is currently stored by the Department of Justice, Child Exploitation and Obscenity Section located at 1301 New York Avenue, Washington, D.C.

# ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to the commission of violations of Title 18, United States Code, Sections 2251(a) (sexual exploitation of children), 2252A(a)(2) (distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), 2422(b) (coercion and enticement of a minor), 2423(c) (illicit sexual conduct in foreign places), 875(d) (interstate communications), and 3261 (criminal offenses committed by certain members of the Armed Forces) (collectively, the "TARGET OFFENSES"), as described in the search warrant affidavit, including:

a.      Establishing or documenting the commission of the TARGET OFFENSES, including information, correspondence, records, documents or other materials constituting evidence of or pertaining to child pornography, child erotica, or access to children; or constituting evidence of or pertaining to the production, possession, receipt, distribution, accessing, or transmission through interstate or foreign commerce of child pornography, child erotica, or visual depictions of minors engaged in sexually explicit conduct; or constituting evidence of or pertaining to an interest in child pornography or sexual activity with children;

b.      Identifying locations where the individual committed the TARGET OFFENSE, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

c.      Reflecting the ownership and use of the TARGET DEVICE identified in Attachment A by the individual committing the TARGET OFFENSES;

      d.      Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

      e.      Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

      f.      Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

      g.      Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES, to include visual depictions of minors engaged in sexually explicit conduct (i.e., child sexual abuse material or child pornography);

      h.      Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the TARGET OFFENSES;

      i.      Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

      j.      Evidence of who used, owned, or controlled the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

      k.      Evidence of software, or the lack thereof, that would allow others to control the TARGET DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.      Evidence of the attachment to the TARGET DEVICE of other storage devices or similar containers for electronic evidence;

m.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICE;

n.      Evidence of the times the TARGET DEVICE was used;

o.      Passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICE;

p.      Documentation and manuals that may be necessary to access the TARGET DEVICE and TARGET DEVICE, or to conduct a forensic examination of the TARGET DEVICE and TARGET IMAGE;

q.      Records of or information about Internet Protocol addresses used by the TARGET DEVICE;

r.      Records of or information about the TARGET DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

s.      Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF A SEAGATE 3TB HARD DRIVE CONTAINING A FORENSIC IMAGE OF A SAMSUNG CELLULAR PHONE LOCATED AT 1301 NEW YORK AVE NW WASHINGTON, DC** | **25-SW-109**<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Kim L. Speakman Jr., being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, A Seagate 3TB hard drive (SN: Z1F0NMF4) containing a forensic image of a Samsung cellular phone (hereinafter, the "TARGET DEVICE"), hash value 02C69D186CD4AAD2267BAB737DED6972 and file name "EXTRACTION_FFS.zip," (hereinafter, the "TARGET IMAGE"), as described in Attachment A that is currently in the possession of the Department of Justice, Child Exploitation and Obscenity Section, located at 1301 New York Avenue, Washington, DC 20530. Such a search would include an examination of the forensic image that was obtained from the TARGET DEVICE for information described in Attachment B.

2.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

4.      Your Affiant is a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been a Special Agent employed by ICE since October 2010. I am currently assigned to the Department of Homeland Security, Cyber Crimes Center ("C3"), Child Exploitation Investigations Unit ("CEIU"). I attended and graduated from the Immigration and Customs Enforcement Special Agent Training program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. Additionally, in 2004, I attended and graduated from the Criminal Investigators Training Program and the Air Force Special Investigations Academy. Pertinent to this affidavit, I was employed by the United States Air Force as a Special Agent with the Air Force Office of Special Investigations ("AFOSI") from approximately 2004 to 2007. While working as an AFOSI Special Agent I conducted and participated in criminal investigations covered under the Uniform Code of Military Justice. I possess a bachelor's degree in criminal justice, which I obtained from Wilmington University located in Delaware.

5.      I have conducted, participated in and/or received training in numerous investigations of criminal activity, including, but not limited to, the investigation of narcotics offenses, money laundering, fraud, child pornography, alien smuggling, human trafficking, rape, assault, suicide, and Title III wire communication interception investigations. During investigation of these matters, I have executed, and participated in the execution of, search and arrest warrants, and have seized evidence relating to violations of the United States Code, Uniform Code of

Military Justice, and the Penal Code of California. I have received training in conducting Peer-to-Peer file sharing investigations related to child pornography, attended a five-day Internet Crimes Against Children ("ICAC") undercover operations course, and attended national conferences related to child exploitation case work. I have conducted numerous state and federal investigations involving the sexual exploitation of children and child pornography.

6.      As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter.

8.      Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18, United States Code, Sections 2251(a) (sexual exploitation of children), 2252A(a)(2) (distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), 2422(b) (coercion and enticement of a minor), 2423(c) (illicit sexual conduct in foreign places), 875(d) (interstate communications), and 3261 (criminal offenses committed by certain members of the Armed Forces) (collectively, the "TARGET OFFENSES") have occurred. There is also probable cause to search the TARGET IMAGE, further described in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE PROPERTY TO BE EXAMINED

9.    The property to be searched is a Seagate 3TB hard drive (SN: Z1F0NMF4) containing a forensic image obtained from a Samsung cellular phone, IMEI 352651793789110. The file name of the forensic image obtained from this phone is "EXTRACTION_FFS.zip" and the hash value is 02C69D186CD4AAD2267BAB737DED6972, hereinafter, "TARGET IMAGE." The Seagate 3TB hard drive (SN: Z1F0NMF4) containing the TARGET IMAGE is currently stored by the Department of Justice, Child Exploitation and Obscenity Section located at 1301 New York Avenue, Washington, D.C.

10.    A forensic image, also known as a forensic copy, is a bit-for-bit direct copy of data stored on an electronic device, including all files and folders in allocated, unallocated, free, and slack space. Forensic images are created through specialized forensic tools designed to preserve the integrity of data extracted from a digital device. This specialized software assigns a unique "hash value" to the forensic image. Hash values are used to verify that digital evidence has not been altered since it was collected. As a result, if the contents of a file—such as a forensic image—are modified, the hash value will also change.

## CURRENT LOCATION OF THE SEAGATE 3TB HARD DRIVE CONTAINING THE TARGET IMAGE

11.    Pursuant to the military search and seizure authorization, Army criminal investigators conducted an initial forensic search of the TARGET DEVICE and data contained therein. This search produced the TARGET IMAGE. Army criminal investigators transferred the TARGET IMAGE and the TARGET DEVICE to the Department of Justice, Child Exploitation and Obscenity Section (CEOS). The TARGET IMAGE is stored on a Seagate 3TB hard drive (SN: Z1F0NMF4) located at 1301 New York Avenue, Washington, DC 20530.

## PRIOR SEARCH WARRANT FOR THE TARGET IMAGE

12.     On October 18, 2024, Magistrate Judge Moxila A. Upadhyaya in the United States District of Court for the District of Columbia signed a search warrant authorizing the search and seizure of the TARGET DEVICE. *See* No. 24-sw-325 (D.D.C). Since receiving the warrant to search the target device, digital investigative analysts with CEOS used forensic software in an attempt to unlock the TARGET DEVICE create their own forensic image of the data contained on the TARGET DEVICE.

13.     However, between the Army's data extraction and the TARGET DEVICE arriving at CEOS, the TARGET DEVICE powered off and subsequently reverted to a "before first unlock" state. Where a device is in a "before first unlock" state, its data is securely encrypted until the user enters their screen lock passcode. Since receiving the October 18, 2024 warrant to examine the TARGET DEVICE, digital investigative analysts with CEOS have used forensic tools in an attempt to bypass its encryption.[1] Despite diligent efforts employing reliable forensics tools, digital investigative analysts with CEOS have been unable to unlock the TARGET DEVICE or otherwise bypass its encryption. Accordingly, digital investigative analysts with CEOS have been unable create a forensic image of the TARGET DEVICE.

14.     Out of an abundance of caution, this search warrant seeks authorization for seizure and an additional search of the Seagate 3TB hard drive (SN: Z1F0NMF4) containing the TARGET IMAGE and records contained therein.

---

[1] Depending on the strength of a device's password, forensic tools may take months or years to break the password and bypass encryption. For example, an 8-character password of numbers, upper- and lower-case letters, and symbols could take up to 7 years to crack using specialized hardware and software. *See* https://www.hivesystems.com/blog/are-your-passwords-in-the-green (last accessed April 9, 2025). A similar 9-character password could take up to 479 years to crack and a similar 10-character password could take 33,000 years to crack.

## PROBABLE CAUSE

15.    In approximately August 2021, the Greensboro FBI office contacted United States Army CID investigators assigned to the Carolinas Field Office and advised that 24-year-old, Christian ROWE ("ROWE") was suspected of "engaging in cyber stalking and extortion of multiple civilian female minors in North Carolina." ROWE was an enlisted Soldier in the United States Army[2] who was stationed in Germany between December 2021 and June 2024.

16.    Army CID received information from FBI officials which outlined complaints from parents of two different 17-year-old female minors. The parents voiced complaints related to an unidentified individual harassing their daughters and other family members via multiple social media platforms. The reporting parties provided numerous social media accounts related to the unwanted activity.

17.    The Greensboro FBI office also received a complaint from a female who attended middle school with ROWE and knew him as a teenager. The reporting party said she was threatened by an unidentified person, via social media, and believed the perpetrator to be ROWE. The reporting party explained ROWE had harassed other people who had also attended middle school with ROWE. Law enforcement obtained various subscriber records for multiple social media accounts and a phone number linked to the investigation and ROWE. Both the SBI and FBI terminated their investigation, deferring the matter to the Army CID.[3] The investigation led to Landstuhl, Germany, where ROWE was stationed until he returned to the U.S. in approximately July 2024.

---

[2] According to U.S. Army documents, ROWE entered active duty on March 10, 2020. Enlistment records show ROWE's home of record is in Kalamazoo, Michigan and that he attended high school at Davie County High School and North Carolina Leadership Charter Academy in North Carolina.

[3] The U.S. Army pursued charges against ROWE related to harassment of an adult German national, but not for his online activity against minors.

18.     In November 2021, Army CID investigators arrested ROWE in Germany and seized a Samsung cellular phone from his person pursuant to a military search authorization.[4] ROWE was subsequently released to his military command staff, and shortly thereafter CID investigators seized additional digital devices from ROWE while at his off-base housing.

19.     Initially ROWE declined to speak with investigators. However, over a year later on March 10, 2023, ROWE agreed to speak with investigators and waived his legal rights. During the interview, ROWE admitted to stalking and attempting to extort various adult and juvenile females. ROWE also explained he used various Internet platforms to find girls between approximately 13 and 17 years of age and promised payment for nude photographs and videos. ROWE explained he would victimize adults as well as minors. After receiving nude photographs and videos from the female victims, ROWE explained he blackmailed the victims into sending more nude photographs and videos. During the interview, ROWE estimated he victimized between approximately 100 and 250 individuals across the United States. However, at another point during the interview, ROWE said he successfully obtained material from approximately 250 to 500 individuals and said he, "primarily chose people he didn't know."

20.     Pursuant to the military search authorization, the Army CID seized the TARGET DEVICE and produced the TARGET IMAGE. On October 18, 2024, Magistrate Judge Moxila A. Upadhyaya in the United States District of Court for the District of Columbia signed a search warrant authorizing the search and seizure of the TARGET DEVICE.

---

[4] An initial search authorization ordered the search of the person, place of duty, and vehicle of PFC Christian T. Rowe. The initial search authorization was for the property, and digital forensic examination thereof, described as personal cellphone(s), computers, and any other digital devices for images, videos and communication between ROWE and multiple females listed by name. During initial contact with ROWE, CID investigators seized the TARGET DEVICE.

21.     Though the TARGET DEVICE is now located at the Department of Justice, the use of forensic tools has failed to unlock the device and to produce a new forensic image. Out of an abundance of caution, this search warrant seeks authorization for seizure and an additional search of the TARGET IMAGE and records contained therein.

### ROWE's Messages to A.W., A.R., and K.H.

22.     In September 2020, the Greensboro FBI office received a complaint from an 18-year-old female, hereafter referred to as K.H., regarding online threats. In an interview with the FBI on October 5, 2020, K.H. explained that when she was 16 years old, she was spammed with phone calls from a blocked caller and received threats from an anonymous Snapchat[5] account asking her to send nude photographs of herself. K.H. explained that around April 1, 2018, she received Snapchat messages from someone who spammed her with personal information about herself including her address, names of her family members, and the name of her school. According to an FBI summary report, K.H. "believed the person who received her nude photographs and harassed her online was Rowe." K.H. explained she felt pressured to send nude photographs of herself because ROWE told her he had access to the "deep web." K.H. sent nude material of herself on five or six occasions over the course of a month. After ROWE received the nude pictures, ROWE told her that he would send them to her family, friends, and the principal of her school. In April or May 2019, approximately a year after K.H. sent the nude pictures to ROWE, he used burner phone numbers to text and call her. ROWE sent her the nude pictures that she had taken and sent to him a year earlier.

---

[5] Snapchat is a mobile social media application which allows users to share photos, videos and text. Snapchat users can take photos or videos ("Snaps") using their camera phone in real-time and then select which of their friends to send the message to. The sender or recipient may manually save photos, video, or messages; otherwise, the messages will be deleted from their devices (after the content is sent in the case of the sender and after it is opened in the case of the recipient). Users can save a photo or video they have taken locally to their device.

23.     K.H. explained she and ROWE used to be friends, and they attended middle school together in North Carolina. K.H. alleged ROWE harassed other people who also went to the same middle school. K.H. provided names of two friends (identified hereafter as A.R. and A.W.) who were also harassed by ROWE. K.H. provided various social media accounts she said ROWE used to contact her, including the following: @anarichardson2020; @unitatoh4evah; @briannastandford; @briannalillystandf; @gamingkoalaftw;[6] and @lexislit219.

24.     K.H. said that approximately a week and a half before the interview, ROWE tried to contact her on Instagram[7] using the username @anarichardson2020 and said he wanted to "make a deal."

25.     During an interview with law enforcement, A.R. explained she sent nude pictures of herself to ROWE in 2019 via Snapchat when she was under the age of 18. A.R. explained that in September 2019 she began to receive messages over Snapchat, and the person who utilized Snapchat account "Mattw2193" said he would give A.R. $1,000 if she sent nude images of herself. A.R. sent three standing nude images, of which two had her face depicted in the photographs. Snapchat user "Mattw2193" requested additional nude images. A.R. declined which prompted "Mattw2193" to send details about A.R.'s name, school, and family members to A.R. and subsequently threatened A.R. if he did not get what he wanted. A.R. said after the incident she identified the user to be ROWE due to the details provided to her and from knowing ROWE in the past engaging in similar activity with her friends K.H. and A.W.

---

[6] A.W. provided a screenshot where the user of the Instagram account "gamingkoalaftw" posted a picture of a person who appeared visually similar to ROWE departing the Augusta, Georgia airport with his Army drill instructor.

[7] Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com. Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

26.    Another victim, A.W. (DOB: 02/08/2002) communicated with law enforcement via email, as she was attending college out of state. A.W. explained she and ROWE were "close friends" about six or seven years ago. A.W. further stated ROWE first contacted her while in the 9th grade and last contacted A.W. "about a week ago[8] on a burner Snapchat account." A.W. further noted the messages from ROWE "included my mother's address and a threat to her and I blocked the account." A.W. said ROWE contacted her via Instagram and Snapchat and also harassed her via phone. ROWE demanded that A.W. send him nude photos of herself. ROWE told her that if she refused, he would send nude photos of A.R. to the members of A.R.'s sorority. A.W. stated that ROWE sent the nude photos of A.R., who was 16 years old at the time they were taken, to A.R.'s sorority. A.W. stated that ROWE later sent her nude images of other girls who she believed to be underage and threatened A.W. that if she did not send him nude photos of herself, he would distribute the other girls' photos online.

### ROWE's Messages to H.B. and A.G.

27.    Around December 2020, a woman contacted the SBI to report that in late 2020, her then 17-year-old daughter H.B. received harassing Instagram messages from an unknown person. H.B.'s mother further explained that the unidentified person demanded nude photographs from H.B and threatened to put her name on a sex trafficking website when she refused. The perpetrator utilized numerous social media accounts including the following Instagram accounts: @clydereed2411; @switch_steps22; @alla.h561; @ashcat48; @warning934; and @stev_ielove. As detailed below, ROWE's email and phone number are associated with these accounts. H.B.'s mother provided digital files which showed communication with the aforementioned accounts. Communication included the following:

---

[8] i.e., approximately October 8, 2021.

a. **Message from @switch_steps22**:

    i. "I beg of you call my bluff, its not that hard to find people"

    ii. "I uploaded you to a human sex trafficking site" [9]

b. **Messages from @ashcat48 and the name "Ashton:"**

    i. "I will tell you this once"

    ii. "She does what I want for 24 hours and I stop"

    iii. "If she doesn't, ill make hell rain down, and im really good at raining down hell"

    iv. "Okay I will be seeing you when you go home"

    v. "You live in high point right"

    vi. "Got that big tree in your back yard"

    vii. "Right there on Norse st"

    viii. "I heard your warnings you heard mine I don't give a fuck"

    ix. "You think so? The amount of years I have been doing just this. Its all so great. If I get caught in [H.B.] then it was meant to be"

    x. "Last fucking chance to stop me bitch"

c. **Message from @warning934:**

    i. "My name is Sean, I was looking thru the onion sites and came across a picture of yourself and your address"

    ii. "There is a 250k bounty on your head put out there by an ashton"

d. **Message from @stev_ielove:**

---

[9] During his interview with law enforcement, ROWE explained that he threatened to post his victims on human trafficking websites.

        i.    "Yes you are sun-kissed baby"[10]

        ii.    "Last chance to stop me bitch"

    e.  **Message from "Ashton Cutler" to H.B.'s brother:**

        iii.    "She is on the site now, the longer the is the more danger she is"

        iv.    "Once the bidding process has been made and the winners been determined the first to acquire the asset will be rewarded"

28.    According to an Army CID report, H.B. reported she received communications from ROWE via WhatsApp[11] number 016097574752.

29.    In June 2021, W.G.[12] contacted SBI to report her then 17-year-old daughter, A.G., was being harassed by someone online. W.G. outlined that the perpetrator utilized a Snapchat account portrayed to be H.B. When A.G. determined that the account did not belong to H.B., she blocked the account. As soon as A.G. blocked the account, a second account appeared on Snapchat with the same name and wrote, "Want me to stop, add me back."

**Investigative Activity Conducted by SBI**

30.    The SBI obtained the following subscriber records, via administrative subpoena process, related to various Instagram accounts. These accounts are all associated with the phone number (336) 608-1990, which is the AT&T phone number assigned to ROWE. These accounts are also associated with the email address blackhawk0915@gmail.com,[13] which ROWE stated is

---

[10] This is a reference to a quote H.B. posted on her other social media accounts. ROWE presumably sent this message to indicate to H.B. that he had identified her on other social media platforms.

[11] WhatsApp is an instant messaging and Voice-Over-IP service which allows users to send text messages, voice messages and video messages, make phone and video calls and share digital files with other users.

[12] H.B.'s mother and W.G. are friends, and their daughters are friends as well. W.G. messaged H.B.'s mother and told H.B.'s mother that W.G.'s daughter and another friend had a similar experience with an unidentified person asking for nudes and threatening to post pictures on the Internet. W.G. further explained the perpetrator had a lot of personal information about the girls.

[13] This email address correlates with ROWE's date of birth, which is 09/15/1999.

his email address.

a. Instagram username @alla.h561 had an account registration date listed as November 2, 2020, via registration Internet Protocol ("IP") address 204.116.189.33, and phone number (336) 608-1990 with email address blackhawk0915@gmail.com;

b. Instagram username @stev_ielove had an account registration date listed as November 22, 2020, via registration IP address 204.116.189.47, and phone number (336) 608-1990 with email address blackhawk0915@gmail.com.

c. Instagram username @switch_steps22 had an account registration date listed as November 22, 2020, via registration IP address 45.132.227.71, and phone number (336) 608-1990 with email address blackhawk0915@gmail.com.

d. Instagram username @warning934 had an account registration date listed as November 27, 2020, via registration IP address 45.41.134.51, and phone number (336) 608-1990 with email address blackhawk0915@gmail.com.

e. Instagram username @clydereed2411 had an account registration date listed as December 20, 2020, with phone number (336) 608-1990 with registered email address clydereed241@gmail.com.

f. Instagram username @ashcat48 had an account registration date listed as October 14, 2020 via registration IP address 193.56.116.54, and phone number (336) 608-1990 with registered email address blackhawk0915@gmail.com.

31.     The SBI issued an administrative subpoena to AT&T for subscriber records related to phone number (336) 608-1990 with a timeframe of October 1, 2020 to January 7, 2021. AT&T responded to the subpoena and provided data which showed the account was associated with Jack

N Rowe at 4382 Briar Hill Drive, Portage, Michigan 49024 and assigned to customer Christian ROWE, at 5382[14] Briar Hill Drive, Portage, Michigan 49024, with email account gamingkoalaftw@gmail.com.

### ROWE's Messages to P.B.

32.    In 2021, a German national female, hereafter referred to as P.B., reported to German law enforcement that ROWE harassed her online. P.B. explained that after ROWE'S failed attempt at a romantic relationship with her, ROWE began to harass her via telephone and on social media. P.B. stated ROWE threatened to publish nude photographs of her on the Internet if she did not respond to his demands.

33.    During contact with law enforcement, ROWE denied the allegation and German police warned him not to contact P.B. According to an Army CID report, ROWE admitted to communicating with P.B. via WhatsApp number 016097574752.[15] ROWE further admitted to communicating with P.B. via Snapchat username "koalaofgames" and Instagram username "gamingkoalaftw." Based on this conduct, ROWE was charged with and pleaded guilty to numerous criminal violations the Uniform Code of Military Justice.

### Search and Arrest by Army CID

34.    On November 4, 2021, Army CID investigators in Germany applied for and received an authorization from a military magistrate to search ROWE's person, place of duty and vehicle for "personal cellphone(s), computers, and any other digital devices for images, videos and communications" between ROWE, A.W., K.H., A.R., H.B., and A.G.

35.    On November 5, 2021, Army CID investigators located and arrested ROWE in

---

[14] 5382 appears to be a typographical error as all other data on the subpoena return reflect 4382.

[15] WhatsApp number 016097574752 is the same number reportedly used by ROWE according to H.B. See Paragraph 22 above.

Germany where he was stationed with the Army. During contact with ROWE, Army CID seized the TARGET DEVICE pursuant to the military search authorization and created the TARGET IMAGE using forensic software. Army CID investigators searched ROWE's on-base living quarters located at Building 3824, Room 104, Landstuhl Post, Landstuhl, Germany (ROWE's assigned base housing). During the search of ROWE's barracks room, investigators learned ROWE did not actually reside there as noted by ROWE's roommate, and the observation that none of ROWE's belongings were in the room. Investigators learned ROWE resided at another residence (off-base housing) located at Eichenstrasse 5, Haupstuhl, Germany 66851. Army CID investigators seized various other devices from ROWE at his off-base residence.

36.    Subsequent to arrest, Army CID investigators interviewed ROWE. Initially ROWE waived his legal rights and denied allegations related to stalking, extortion, indecent broadcast, and possession of child pornography. ROWE later requested legal counsel, and the interview was terminated. On December 13, 2021, ROWE informed his military chain of command that he wished to speak with CID agents. On December 14, 2021, ROWE called Army CID SA Groce and requested to speak with Army CID SA Ryen Rascon. SA Groce informed ROWE he could contact SA Rascon after ROWE completed the behavioral health treatment he was receiving.

**Second Interview with ROWE**

37.    Over a year later, on March 10, 2023, Army CID attempted another interview with ROWE. During the second interview, ROWE waived his legal rights and agreed to speak with the investigator.

38.    ROWE explained when he was younger (approximately 12 or 13) he started having issues with "depression" as people were "picking on" and "fucked" with him. ROWE explained when he was in the eighth grade, he attended the North Carolina Leadership Academy ("NCLA").

ROWE said he always felt like a "loner."

39.     ROWE explained he "got fucked with" and noted he was never "included" and was forced to grow up at a young age. ROWE explained while going to the NCLA, most people just "steered clear" of him. ROWE described how he was close with a group of girls[16] who later abandoned him and spread rumors about him, so he "started trying to get revenge on people who had done me wrong" by engaging in "bullying" and "psychological warfare" against them online. This consisted of demanding naked photos from one of the girls and threatening suicide when she did not comply.

40.     ROWE explained that one of the victims[17] was 18 years old at the time she responded and sent nude pictures of herself that were taken when she was 17 years old.[18] ROWE said the aforementioned girl eventually stopped responding to his attempts at contact.

41.     ROWE said he began engaging in illegal online activity when he was approximately 16 years old (in approximately 2016) and ended when he was arrested in November 2021.

42.     When asked about activity after entering active duty with the Army, and if he was "still doing stuff on Snapchat," ROWE responded affirmatively and shook his head up and down. ROWE estimated that he had created as many as 250 accounts on Snapchat.

43.     When asked about his online activity, ROWE explained he was active for a short time while in basic military training as he was quarantined for a short while. ROWE explained that

---

[16] During this part of the interview, ROWE provided first names for two of the girls, both beginning with the letter "A." From the context of the interview, it appears that ROWE was referring to victims A.R. and A.W.

[17] From the context of the discussion, ROWE appears to be referring to victim A.R.

[18] At this point in the interview, ROWE states that the victim was 18 years old when she sent the photos, but the photos were taken when she was "under." From the context of the discussion, it can be inferred that "under" means "underage." Further, later in the interview, ROWE explicitly states that the photos were taken when this victim was 17 years old.

he resumed his online activity after he finished basic training in approximately June 2020 and went to Advanced Individual Training ("AIT") at Fort Gordon, Georgia during times when his phone was available. While discussing his online activity targeting females, ROWE estimated that he conducted his online scheme with about 20 people during his first year of military service but could not recall a total number of people he engaged with online during his entire military service.

44.    ROWE said he primarily used Snapchat and would use Instagram as "recon" (i.e., reconnaissance) to select victims online. ROWE explained that the victims' Snapchat accounts usually displayed their first and last names. ROWE stated that he used these names to find the victims' accounts on Instagram, and once he confirmed that the two accounts belonged to the same person, he found photos of them and gathered all the personal information he could find about them. ROWE explained he first tried to convince the victims to send nude photos in exchange for money, but if that did not work, he turned to "threats," including "posting them on a trafficking site." ROWE said he did not know if the trafficking sites really existed or not. To bolster the threats, he messaged the victims from alternative accounts where he posed as a different individual and claimed that he had seen the victims' pictures on a trafficking site.[19] ROWE described his victims as those who were "too scared to stand up and say I'm done, and those who continue to send until they are released."[20]

45.    ROWE explained that his desktop computer which was seized by Army CID had digital photographs of a victim on the device. ROWE explained the photographs were of "one of the very first victims" who he met on Skype. ROWE said the digital files would be easy to find on

---

[19] From the context of the conversation, ROWE led the victims to believe that other individuals had actually seen their photos and their identity on the trafficking websites.

[20] From the context of the conversation, ROWE meant that he "released" the victims from his requirement to provide him sexually explicit material.

his computer, as they would be in his "documents" or "screenshots" folder with a file name associated with the victim's first name and/or her first name with a number. ROWE explained there were files related to Omegle[21] and Bandicam[22] on that computer. ROWE noted that he used Bandicam to record his screen while he used Omegle to find victims. ROWE explained he also used Snapchat's "Quick Add"[23] feature to find new victims.

46.    ROWE explained he used Omegle to search for victims. ROWE said he offered them money to send him nude photos and videos. ROWE said he started this activity when he was in high school and that he continued until his arrest in 2021. ROWE explained he disguised his location using fake GPS location services.

47.    ROWE said he posted sexually explicit material he received from his victims on Instagram, Snapchat, and 4chan.[24]

48.    ROWE explained that he would try to obtain pictures that included the girls' faces so that he could have these photos available "if I wanted to blackmail them with it." He went on to explain how he used pictures of the victims' faces to further his scheme.

49.    ROWE explained that image files depicting the victims were initially saved on his OneDrive account, but he acknowledged he had since deleted the files from that account. ROWE also explained he was unable to delete data from "Samsung's cloud" because he did not have access to his account. ROWE explained that his Samsung cloud account was associated with the email address blackhawk0915@gmail.com and estimated that the account contained approximately 8,000 photos of victims. ROWE stated that blackhawk0915@gmail.com was his

---

[21] Omegle is a free online video chat service that allows users to communicate with other users on the platform anonymously.

[22] Bandicam is a screen recording software.

[23] "Quick Add" is a feature on Snapchat that suggests potential friends based on mutual friends.

[24] 4chan is an image-based bulletin board internet website where users can share digital files and post comments.

email address. With respect to the nature of the digital files on the account, ROWE stated, "unfortunately, it's pretty heavy-sided on the bad shit."

50. When asked about his laptop computer, which was seized by Army CID, ROWE said he thought he transferred most of the relevant files from the laptop. ROWE acknowledged he may have plugged his phone into the laptop as he used the laptop for charging. ROWE said the laptop "might have something [incriminating]" on it.

51. When asked about his tablet which was seized by Army CID, ROWE said the tablet "should have zero [images or videos of victims]" on it because he had only used the tablet to play the piano.

52. When asked about his online activity while stationed in Germany, ROWE explained he victimized one German national (P.B.) with his online extortion scheme and noted, "it was mostly just people back in the States." ROWE explained his actions towards P.B. were to try and carry on a relationship with her and "work things out."

53. When asked how many other people he victimized with his online scheme while stationed in Germany, ROWE expressed having a difficult time remembering but estimated approximately "a couple hundred." ROWE said he did not know the victims. Later in the conversation, ROWE explained he received pictures from approximately 100 to 250 victims. ROWE said he may have known between 5 and 30 of the victims and he "primarily chose people he didn't know."

54. ROWE discussed particular circumstances in which he threatened female victims into sending material of themselves. ROWE acknowledged multiple victims included females he knew from high school, as well as females across the United States who he did not know. ROWE explained his online victimization of some of the girls and acknowledged he did "leak" material

from at least one of his victims.

55.    ROWE was asked about having material which depicted victims under the age of 18. When asked what percentage of his pictures and videos depicted underage girls, ROWE said, "the majority of them." ROWE said the youngest victim may be 13 years old. ROWE later said the youngest person he had images of may be 12 years old. When asked how he knew the victims' approximate ages, ROWE stated that his estimates were based on attributes like wrinkles and pubic hair. ROWE also stated that he received material from a female who was over 18 years old, however the material depicted her when she was underage.

56.    During a discussion about targeting minors, ROWE said he would not approach some people (online) until he had enough information such as where they lived, how to find them, or what school they attended. ROWE further explained if he knew where they lived, then he could conduct a search such as, "schools nearby." ROWE also noted that based upon the address (of the victim) he could ascertain what the family's financial situation might be. ROWE explained how he could tell that some victims' families may have been "not too fortunate with finances, because some of them sent, not for themselves but for their family. They're trying to help their family out by getting money from me, so that their family can pay rent."

57.    ROWE stated that he used "The Onion Router" to access a "porn" website with "underage" girls. Based on my training and experience, "The Onion Router" or "TOR" is a computer network available to Internet users that is designed specifically to facilitate anonymous communication over the Internet.

### Overview of Probable Cause to search the TARGET IMAGE

58.    Based upon the foregoing, I believe there is probable cause to search the TARGET IMAGE for evidence of the TARGET OFFENSES. I believe this, in part, because probable cause

exists to believe ROWE stalked, coerced, and extorted minor females to send him nude photographs and videos of themselves. Probable cause also exists to show ROWE used the nude photographs and videos to blackmail the minor victims into sending more explicit material. Further, probable cause exists to believe that contraband, evidence, fruits, and instrumentalities of these violations will be located on the TARGET IMAGE. As such, I believe there is probable cause to search the TARGET IMAGE for evidence related to the TARGET OFFENSES.

### <u>JURISDICTION OVER EXTRATERRITORIAL CRIMINAL CONDUCT</u>

59.     Title 18, United States Code, Section 2423(c) provides "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both."

60.     Additionally, the Military Extraterritorial Jurisdiction Act provides jurisdiction over criminal offenses committed by certain members of the Armed Forces and by persons employed by or accompanying the Armed Forces outside the United States. Title 18, United States Code, Section 3261(a)(2) provides "[w]hoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States—[…] (2) while a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice), shall be punished as provided for that offense."

61.     ROWE's criminal conduct includes illicit sexual conduct (i.e., engaging in and attempting to engage in the production of child pornography) while in Germany and a member of the Armed Forces subject to the Uniform Code of Military Justice.

## THE TARGET IMAGE

64.    I have experience investigating the statutes underpinning probable cause. The TARGET OFFENSES involve visual depictions of minors engaged in sexually explicit conduct received, stored, and distributed with applications commonly used on mobile devices. Further, ROWE explained that his "Samsung cloud" account contained approximately 8,000 visual depictions of victims. The TARGET IMAGE is a forensic image of the Samsung mobile phone that Army CID agents seized from ROWE's person.

65.    Your affiant knows that cellular telephones and their forensic images contain valuable information and evidence relating to the TARGET OFFENSES. Such information consists of, but is not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the TARGET OFFENSES; (ii) identify locations relevant to the TARGET OFFENSES; (iii) reflect the ownership and use of the cellular telephones by persons involved in the commission of the TARGET OFFENSES; (iv) document meetings and communications between associates, and co-conspirators of the TARGET OFFENSES; and (v) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband relating to the TARGET OFFENSES.

66.    In summation, the execution of a search warrant on the TARGET IMAGE would allow law enforcement to, among other things, gather evidence of ROWE's use of social media applications, including Snapchat and Instagram, to employ, use, persuade, induce, entice, and coerce minors to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct. Additionally, evidence from the TARGET IMAGE may yield

ownership information of the TARGET DEVICE. All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES.

**TECHNICAL TERMS**

67.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     The terms "digital device" or "electronic device" as used herein, include the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices

(including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

        b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touchscreen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired

or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

e.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.    Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service

providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a username or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

       m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

       o.     "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the

functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it, but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

68.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found

within the forensic image of the Samsung phone, in whatever form they are found. One form in which such items might be found on a forensic image include in files, in messaging applications, in user attribution data, and in device usage history. Thus, the warrant applied for would authorize the search of the existing forensic image, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the forensic image for at least the following reasons:

      a.  Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      b.  Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may

also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

69.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the forensic image at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.

Digital data stored in the TARGET IMAGE, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.     I know that when an individual uses a digital device to employ, use, persuade, induce, entice, and coerce minors to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit

a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

<u>**METHODS TO BE USED TO SEARCH DIGITAL DEVICES**</u>

70.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of the forensic images of digital devices, I know that:

a.    Searching forensic images of digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled

environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

      d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a

computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.

f.    Based on all of the foregoing, I respectfully submit that searching any forensic image of a digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

71.    The analysis of the contents of the forensic images of digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

72.    In searching the TARGET IMAGE, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to

determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## CONCLUSION

73.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET IMAGE contains evidence of the TARGET OFFENSE.

74.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

75.     I further request that the Court permit the search warrant to be executed at any time given that the Seagate 3TB hard drive (SN: Z1F0NMF4) containing the TARGET IMAGE is contained on the premises of the U.S. Department of Justice, Child Exploitation and Obscenity Section.

Respectfully submitted,

_____
Special Agent Kim L. Speakman Jr.
Homeland Security Investigations

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 18th day of April, 2025

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE